## EQUITABLE TRUST CO. OF NEW YORK v. GREEN STAR S. S. CORPORATION et al.

### In re AMERICAN MERCHANT MARINE INS. CO.

(District Court, S. D. New York. December 9, 1922. Supplemental Opinion December 22, 1922.)

1. **Corporations ⬲486—Sinking fund under mortgage held trust fund for holders of those obligations which trustee was required to pay.**

   Under corporate mortgage securing bonds payable at different times and requiring mortgagor to pay trustee a specified amount every two months as sinking fund for payment of bonds maturing and interest accruing at next succeeding interest date, a sinking fund was trust fund, and beneficiaries were holders of those obligations which the trustee was required to pay.

2. **Corporations ⬲486—Holders of next maturing bonds and interest coupons held entitled to sinking fund where their obligations became due before trustee acted.**

   Where corporate mortgage securing bonds payable at different times required mortgagor to pay trustee every two months, as sinking fund for payment of bonds maturing and interest accruing at next succeeding interest date, one-third of such principal and interest, further provision that, in event of default, proceeds of sale, together with any other sums then held by trustee, should be applied as therein stated, *held* not to defeat right of holders of bonds and interest coupons next maturing to sinking fund in trustee's hands upon default, where their obligations were payable before trustee took any action because of default.

3. **Corporations ⬲486—Failure of mortgagor to make payments to sinking fund held not to affect rights of holders of obligations entitled to fund in amounts already paid.**

   Under corporate mortgage securing bonds payable at different times and requiring mortgagor to pay trustee every two months, as sinking fund for payment of bonds maturing and interest accruing at next succeeding semiannual interest date, an amount equivalent to one-third thereof, failure of mortgagor to make two of the bimonthly payments *held* not to affect rights of holders of bonds and interest coupons next maturing in the payment which had been made and was in trustee's hands upon default.

4. **Corporations ⬲486—Holders of obligations to which sinking fund applicable held entitled to interest after obligations became due.**

   Where, under corporate mortgage, payments to sinking fund were for payment of bonds and interest coupons due on next interest payment date, holders of such obligations *held* entitled to interest on the fund after their obligations became due.

In Equity. Suit by the Equitable Trust Company of New York, trustee under first mortgage of Green Star Steamship Corporation, dated October 15, 1919, against the Green Star Steamship Corporation and another, in which the American Merchant Marine Insurance Company filed a petition to intervene pro interesse suo. Intervention allowed, and decree to be settled on notice in accordance with the opinion.

William M. Evarts and P. P. Waldrop, all of New York City, for Equitable Trust Co. of New York and Bondholders' Committee.

⬲For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Chadbourne, Hunt & Jaeckel, of New York City, for receiver.

Charles T. Cowenhoven, Jr., and William H. Arnold, both of New York City, for petitioner.

LEARNED HAND, District Judge. It is indeed strange that nothing should be found in the books nearer to this case than Brown v. Penn. R. R. Co. (C. C. A. 3d) 250 Fed. 513, 162 C. C. A. 529. There must have been many cases of sinking funds for issues which fall due in installments—not an uncommon kind of security—and some of these must have come to default. One would suppose that the terms of such mortgages would have invited some such contention as the petitioner here makes. Nevertheless, since counsel have been unable to find any, I must assume that the case is one of first impression outside of the case cited, and treat it accordingly.

[1] That the sinking fund as a whole is a trust fund seems to me too plain for discussion. Rogers, etc., Works v. Kelley et al., 88 N. Y. 234; Holland Trust Co. v. Sutherland, 177 N. Y. 327, 69 N. E. 647. Therefore the question is only as to who are the beneficiaries, whether the whole bondholders or Series C. The sinking fund is not often mentioned in the mortgage. There is merely an allusion to it in the body of the bond, and its substantial definition is in article II, which provides that—

The mortgagor "will pay to the trustee" every two months, "as and for a sinking fund for the payment of maturing bonds and interest accruing at the next succeeding interest date, an amount equivalent to thirty-three and one-third per cent. of the principal amount of the outstanding bonds next maturing hereunder, together with an amount equivalent to thirty-three and one-third per cent. of the semiannual interest accruing at the next succeeding interest date on all outstanding bonds."

Since this provision created a trust of some sort, the beneficiary must be he who is defined in the declaration of trust. The definition is unambiguous enough. "For the payment of maturing bonds and interest at the next succeeding interest date" is a phrase which admits of no escape; it means that the obligations which alone are entitled to the fund are those which the trustee must pay.

[2] There can be no doubt that in the normal course of events these would become the beneficiaries of the fund, and the trustee's position is inevitably resolved into asserting that from some other parts of the mortgage it appears that the destination so indicated may be diverted by events succeeding the deposit. Prima facie, Series C was therefore entitled to $150,000 upon principal and the $5,250 of interest. The remaining $36,750 was the equitable property of the holders of those other coupons which fell due on April 10, 1921. Unless some clause in the mortgage or its general structure are enough to divest Series C of its trust, the petitioner is right.

The sinking fund is next mentioned in section 1 of article IV of the mortgage, which directs the trustee to apply it as before provided; perhaps the direction was unnecessary, but it accentuates the fiduciary character of the deposit. Section 1 of article VII adds nothing of moment; it is only the usual covenant of the mortgagor. These, so far as I can find, are the only mention of the fund. There is in them noth-

ing which affects article II or clouds the equitable title created by it.

If, therefore, it is divested it must be by some inconsistent provisions of the mortgage. The trustee insists that section 11 of article VIII accomplishes just this. The article as a whole controls the remedies of the trustee in case of a breach of any of the mortgagor's covenants. In that case upon default ("event of default"), the trustee may take possession, accelerate the maturity of the principal of all outstanding bonds, sell or foreclose, convey to the purchaser, and divide the proceeds. It is the language of the last provision on which the trustee relies. It is as follows:

"The purchase money, proceeds and avails of any sale of the trust property, together with any other sums which then may be held by the trustee under any provisions of this indenture as part of the trust property or of the proceeds thereof, shall be applied as follows," first to the trustee's expenses, next to the principal and interest, "then owing and unpaid upon the bonds," without preference of interest over principal or vice versa, and last to the mortgagor.

It is clear that so far as relevant at all, the trustee must depend upon the words, "any other sums which then may be held by the trustee * * * as part of the trust property." The argument is that the last sinking fund, which was never distributed, was "held by the trustee * * * as part of the trust property." I agree that in reply to this argument the petitioner presses unduly the word "then," in this clause; it means no more than that the moneys must be still in the trustee's hands and adds nothing to the language. The solution must be less verbal than that. Was it the purpose of the parties to provide that upon a default, the trust created for a part of the bondholders should be so divested?

[3] I regard the obligation under section 1 of article IV as absolute on April 10, 1921. The mortgagor had indeed failed to make the second payment on February 10, 1921, and the third on April 10, 1921; but neither breach justified any action under article VIII under April 13, 1921. Subdivision 3 of section 1 of that article controlled, and notwithstanding the breaches, the relations of the parties were unchanged, except for the ensuing causes of action. On April 10, 1921, what excuse then had the trustee for failing to pay to Series C its proper share of the deposit of December 10, 1920? I confess I can see none. Certainly, it cannot be because the mortgagor had failed to pay the other two-thirds. That could not affect the right to what had already been paid.

If this be true, that is, if Series C had a right to the sum in question, on what theory could the trustee which wrongfully detained that sum claim later that it was part of the funds in its hands for distribution under section 11 of article VIII? In fact, it was; in law, it should not have been. Whatever be the proper meaning of the language, "other sums which may then be held by the trustee * * * as part of the trust property," it must, of course, be read to include only such sums as the trustee then rightfully held. To succeed it must appear that the trustee had the right, because of the breach of the mortgagor's covenant under section 1 of article VII, to refuse to perform its own covenant under section 1 of article IV. There was no dependence be-

tween these two covenants. Therefore, while I do not agree with the petitioner in pressing the word "then" as he does, and indeed attach no significance whatever to it, in the end he and I come out at the same place.

Other considerations reinforce this conclusion. The language of section 11 of article VIII applies to remedies generally; to what the trustee must do to protect the bondholders as a whole. It was not to be expected that this should divest pre-existing rights created for the benefit of any particular series. The law commonly requires a more specific expression when this is to result; it favors the preservation of rights once established. Nor am I impressed with the argument drawn from the language of the redemption article (article III), especially that at the end of section 4. That is no more than a direction to pay the redemption deposit to the bondholders; is in substance exactly the same as the direction in section 1 of article IV read with article II. If the argument based upon section 11 of article VIII is good as to the sinking fund, it is good also as to any redemption deposit under article III; these would be as much "sums * * * then * * * held * * * as part of the trust property." Suppose there had been such; could it be maintained that they, too, though specifically allocated to numbered bonds, would fall into hotchpot for general distribution? I submit that nobody would go so far.

The truth is that while the general provisions of the mortgage necessarily provided for equality in distribution upon sale, its very structure presupposed previous inequality in payment between the bondholders. Series A and B had already an advantage due to their early maturity. So would Series C, if the mortgagor had lived a little longer. If the deposits of February 10 and April 10, 1921, had been made, no one could seriously maintain that the trustee or any one else could take from that series its advantage. Yet nowhere in the mortgage is the equitable right to any third made dependent upon the payment of the succeeding thirds. Again, there is an obvious inequality in the redemption article (article III), which provides (section 2) for the amortization of the bonds in inverse order of their maturity, possibly in an effort to equalize the amortization by the sinking fund.

Brown v. Pa. R. Co. (C. C. A. 3d) 250 Fed. 513, 162 C. C. A. 529, is not perhaps strictly in point, yet at least it shows that when a sinking fund is created only for the security of a part of the obligations, its express language will not be lightly disregarded because of a supposed general intent. Therefore I regard Series C as entitled to the amount they claim. The rest was interest for the other holders of coupons due on that day. The question whether the trustee was authorized to use this fund in preservation of the res is more difficult, and in view of the fact that the petitioner does not press for immediate payment may in the end prove moot. Should there be enough left on distribution to repay the trustee for all its advances and leave in its hands a net balance of $155,250, Series C will be entitled to a priority to that extent. I decline at the present time to consider the right of the trustee to use the fund.

Similarly it is not yet time to decide whether Series C may prove against the corpus for the full amount of their debt or whether they are

limited to the balance after the sinking fund has been credited. This petitioner, at any rate, asks only to prove for the balance; perhaps the others may do the same. Nor does the possibility that they may not agree with him change the result. Even if the series may prove for the whole, it is not a matter which should go to the interpretation of the mortgage. If it be true, it results from a rule of distribution peculiar to insolvency and not universal, since the opposite rule applies in bankruptcy. Merrill v. National Bank, 173 U. S. 131, 19 Sup. Ct. 360, 43 L. Ed. 640, does indeed hold so much, but that was a case of proof against an insolvent upon a debt in personam by a creditor who had independent collateral. The case at bar is one of proof by cestuis que trustent under a single mortgage, whose security is allocated by the instrument itself. It by no means necessarily follows that the same rule applies to this case as to the situation in Merrill v. National Bank, supra. It may with much plausibility be argued that for the purposes of distribution all the property covered by the mortgage is to be treated as a single fund and that the allocation of one part of it under the mortgage must be regarded when the rest comes up for distribution. Naturally, I express no opinion upon that question at the present time.

[4] A final question is the distribution of the interest credited by the trustee upon the fund under section 3 of article IV. Up to April 10, 1921, the interest so credited belonged to the mortgagor and the general receiver will be entitled to it except in so far as the trustee has a valid set-off. After April 10, 1921, it must go to Series C, because since they were at that time entitled to an immediate payment of the fund, regardless of the appointment of any receiver, any subsequent increment to the fund was on their account. It does not appear except in the briefs of counsel whether the trustee has a set-off and how much it is. Therefore the record is not yet in condition to make a final disposition of so much of the interest as fell due before that day.

The petition is therefore disposed of as follows:

1. The petitioner is allowed to intervene pro interesse suo.

2. Out of the sum of $192,000 deposited with the trustee on December 10, 1920, Series C is declared to have been entitled to an immediate payment of $155,250 on April 10, 1921.

3. The question of the propriety of the trustee's action in using the fund for the protection of the corpus is reserved for further decision if the question ever arises.

4. Upon any surplus after the payment of all disbursements and expenses properly credited against the corpus, Series C is declared to have a priority of $155,250.

5. The question is reserved whether they may prove against the corpus for the balance of their debts or the full amount.

6. The general receiver is declared entitled to all interest upon the fund credited by the trustee up to April 10, 1921, subject to any set-offs allowable to the trustee. Series C is declared entitled to all the remaining interest so credited upon the fund after April 10, 1921, and to a corresponding lien on the corpus as set forth in subdivision 4 above.

Settle decree on notice.

## Supplemental Opinion.

The trustee calls my attention to an error in my opinion in supposing that the due date of the "Series C" bonds was April 10th, when in fact it was April 15th. Ordinarily this would call for no more than a clerical correction, but it so chances that the first "event of default" occurred on April 13th, and that this difference of five days in fact made the default precede instead of follow the due date.

My reasoning depended, in part anyway, upon this mistaken understanding, and it seems to me necessary that I should reconsider the validity of the result. The trustee had been for two days entitled to all the remedies prescribed under article VIII, though it had taken no steps to assert any of them. Did its unconditional power to act after an "event of default" change its obligation to the Series C bondholders? I cannot see why it should do so. The mere fact that the trustee might act was not equivalent to action on its part. Nor indeed would an actual occupation of the res on April 13th have had any effect upon rights which had accrued earlier though they fell due later. As I view article II, it intended to create a fund the contested part of which was irrevocably devoted to Series C, and there was nothing in the mortgage which divested the beneficiaries of their title so acquired. It undoubtedly was a more salient demonstration of that fact, if Series C fell due before the trustee could act at all; but the substance of the argument remains as it was.

To reach a contrary result I must, as before, find in section 11 of article VIII an intention to divest the rights over acquired under article II. There is no indication of such an intention. Even the mortgagor would have been entitled to income falling due after the "event of default" and before the trustee entered personally or by a receiver. The default itself did not change the relations of the parties beyond putting it into the trustee's immediate power to assume possession. When it did, then the consequences of a change of possession followed, but not before. If so, it seems to me a curious result which should divest one set of beneficiaries of an installment due before the trustee entered in any manner, merely because it had acquired the right to enter before the installment fell due. The sums which the trustee is to distribute under section 11 of article VIII, in so far as they do not arise from the corpus itself, are those which have not previously been specifically allotted to any class of the beneficiaries. Probably the clause of that section on which the trustee relies does not include more than the income received after entry, but it is unnecessary to determine positively what it may cover. It is enough to say that whatever that may be, the general terms of the section do not effect any devolution of title from one class of bondholders to the whole.

Therefore, I see no reason for changing the result of my first decision.